THE COMMITTEE FOR REASON-ABLE REGULATION OF LAKE TA-HOE, a Nevada nonprofit corporation, Plaintiff,

v.

TAHOE REGIONAL PLANNING AGENCY, a public agency, Defendant.

No. CVN020558–ECR(RAM).

United States District Court, D. Nevada.

March 29, 2004.

Committee for Reasonable Regulation of Lake Tahoe: Mark H. Gunderson, Law Office of Mark H. Gunderson, Reno, NV, Mark A. Teh and Ronald A. Zumbrun, Zumbrun Law Firm, Sacramento, CA, for Plaintiff or Petitioner.

Tahoe Regional Planning Agency: Jordan C. Kahn and John L. Marshall, Tahoe Regional Planning Agency, Stateline, NV, Fran M. Layton and William J. White, Pro Hac Vice Firm, Shute Mihaly & Weinberger, San Francisco, CA, for Defendant or Respondent.

State of California: Christine A. Sproul, Pro Hac Vice Firm, Deputy Attorney General, State of California, Sacramento, CA, State of Nevada: William J. Frey, Nevada Attorney General's Office, Carson City, Pacific Legal Foundation: Gregory T. Broderick and R.S. Radford, Pro Hac Vice Firm, Pacific Legal Foundation, Sacramento, CA, Tahoe Lakefront Owner's Association: Daniel Maguire, Pro Hac Vice Firm, Davis, CA, Jeremy J. Nork, Hale Lane Peek, et al., Reno, NV, for Amicus Curiae.

### ORDER

EDWARD C. REED, Jr., District Judge.

This action arises from a challenge to the Tahoe Regional Planning Agency's ("TRPA") draft proposal and subsequent adoption of a new scenic review system—the Scenic Review Ordinance—which seeks to regulate the size, color, appearance, visibility, and other aspects of residential housing on littoral and shoreland properties in the Lake Tahoe basin.[1] The Scenic Review Ordinance represents TRPA's response to the declining scenic quality reported in its 2001 evaluation report and TRPA's attempt to develop a more objective and standardized system to limit the "scenic impact" resulting from new residential construction and residential remodels in the shoreland. The Scenic Review Ordinance attempts to encourage structures to integrate and blend with the natural environment rather than contrasting and standing out.

In order to encourage residential structures to blend rather than contrast with the natural environment and to provide different options to shoreland parcel owners, the Scenic Review Ordinance includes new design standards (relating to color and setbacks), different levels of review depending on the extent of the project (ranging from exempt in-kind replacement to a comprehensive review of new residential construction), and different options for compliance (Standard, Visual Magnitude System, or Independent Review). The Visual Magnitude System provides for a comprehensive scoring system, which rates the scenic impact of housing as viewed from the Lake. Basic traits of the proposed structure (such as color, percentage visibility of a structure's perimeter, and articulation and surface texture of a structure's facade) result in an objective color contrast score. A high score translates

---

1. A "Littoral parcel" means "[a] parcel of land adjoining or abutting the highwater elevation of a lake." (TRPA's Code of Ordinances § 2.2, available at *http://www.trpa.org/Ordinances/pdffiles/Chapter2–rev.pdf*.) "Shoreland" refers to "[t]he distance from the highwater line of Lake Tahoe to the most landward boundary of the littoral parcel, or 300 feet landward, whichever is lesser." (Code § 2.2, Def.'s Request for Judicial Notice, Ex. 2 at 2–25.) As discussed in further detail in the body of this opinion, we take judicial notice of many of TRPA's ordinances, including the definitions listed here.

into more allowable visible square footage. Conversely, a low color contrast score results in less allowable visible square footage.

In response to TRPA's draft proposal of the scenic review system and before adoption of a final ordinance, various concerned citizens formed plaintiff, the Committee for Reasonable Regulation of Lake Tahoe (the "Committee"), in order to "promote and support the protection of Lake Tahoe through effective, fair, and reasonable regulation of building development and use within the Lake Tahoe basin." (Compl., ¶ 2.) Unable to persuade TRPA to abandon or reconsider the scenic review system, the Committee filed a complaint (# 2) on October 22, 2002. After TRPA took final action by adopting the Scenic Review Ordinance on November 20, 2002, the Committee filed a supplemental amendment (# 9) to the complaint on January 16, 2003. The complaint and the supplemental amendment asserted various claims for relief, including (1) that TRPA lacked authority to enact the Scenic Review Ordinance under TRPA's Compact, (2) that TRPA lacked substantial evidence to justify the new scenic review system, (3) that the Compact required TRPA to prepare an environmental impact statement, (4) that TRPA effected a taking of the Committee's members' property, (5) that the Scenic Review Ordinance is arbitrary,

vague, and ambiguous, and (6) that TRPA violated the First Amendment.

TRPA filed a motion to dismiss (# 15) on March 31, 2003. The Committee opposed (# 29) the motion and TRPA replied (# 52).[2] We held a hearing on February 19, 2004, and entered an oral order (# 77) dismissing several of plaintiff's claims. We now consider the motion to dismiss with respect to plaintiff's remaining claims, which we denoted as claims one through six above.

## I. GENERAL BACKGROUND: TRPA's PURPOSE, STRUCTURE & THE SCENIC REVIEW ORDINANCE

Before addressing the specifics of the Committee's complaint and TRPA's motion to dismiss, it is necessary to understand the need for regulation at Lake Tahoe, to review the history of regulation at Lake Tahoe, and to examine the role and structure of TRPA in such regulation.

### A. Lake Tahoe's Beauty Leads to Regulatory Problems

Lake Tahoe is an alpine lake located in the northern Sierra Nevada mountains. The lake is renowned for its beauty, including the clarity of its waters. See Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 34 F.Supp.2d 1226, 1230 (D.Nev.1999)[3] ("Lake Tahoe

**2.** The California Attorney General (# 27), Pacific Legal Foundation (# 40), and Tahoe Lakefront Owner's Association (# 47) each filed Amicus Briefs in respect to various issues raised in the motion to dismiss, each of which proved helpful to the Court.

**3.** The Tahoe–Sierra case involved a temporary moratorium on development on certain environmentally sensitive properties in the Basin. While this court found a categorical taking and no taking under Penn Central, the Ninth Circuit reversed this court's holding with respect to the categorical taking. Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 216 F.3d 764, 789 (9th Cir.2000) (finding no

categorical taking and no taking under Penn Central). The Supreme Court subsequently affirmed the judgment of the Ninth Circuit. Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Although this case generated several published opinions, we will refer to this case by Tahoe–Sierra Pres. Council and the citation to the appropriate reporter. Furthermore, the Supreme Court relied heavily on the factual findings of this court, and although this court was eventually overturned on the categorical taking issue, we find it appropriate to include statements from this opinion that are not subject to reasonable

... is a remarkable alpine lake located in the northern Sierra Nevada mountains. The lake is almost indescribably beautiful."); *People ex rel. Younger v. County of El Dorado,* 5 Cal.3d 480, 96 Cal.Rptr. 553, 487 P.2d 1193, 1194 (1971) (commenting that the Lake Tahoe Basin is "an area of unique and unsurpassed beauty."); *Kelly v. Tahoe Reg'l Planning Agency,* 109 Nev. 638, 855 P.2d 1027, 1034 (1993) (agreeing with the district court's conclusion that the Lake Tahoe Basin is "a national treasure"); *see also Tahoe–Sierra Pres. Council,* 34 F.Supp.2d at 1230 (quoting Mark Twain, *Roughing It* 169 (facsimile reprint of 1st ed., Hippocrene Books, n.d.) (1872) ("As [the lake] lay there with the shadows of the mountains brilliantly photographed upon its still surface I thought it must be the fairest picture the whole earth affords.")).

However, Lake Tahoe presents an interesting regulatory challenge because "the more Lake Tahoe comes to be appreciated for its beauty, the more that beauty is threatened." *Tahoe–Sierra Pres. Council,* 34 F.Supp.2d at 1230. Further complicating matters, the Lake Tahoe Basin (the "Basin") occupies 501 square miles and its jurisdiction is shared by the States of California and Nevada, five counties, several municipalities, and the Forest Service of the Federal Government. *Tahoe–Sierra Pres. Council, Inc.,* 535 U.S. at 308, 122 S.Ct. 1465. Although several different entities have responsibilities in the Basin, regulation of the Basin as a whole presents regional problems and the need for a coordinated response to the problem is obvious. *Tahoe–Sierra Pres. Council,* 34 F.Supp.2d at 1232.

## B. TRPA's Compact

In 1968, the legislatures of California and Nevada responded to the regional

problems presented by the unique characteristics of Lake Tahoe and adopted the Tahoe Regional Planning Compact (the "Compact"), which set goals for the protection and preservation of the lake and created TRPA to "coordinate and regulate development in the Basin and to conserve its natural resources." *Tahoe–Sierra Pres. Council,* 535 U.S. at 309, 122 S.Ct. 1465 (quoting *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency,* 440 U.S. 391, 394, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979)). The two states, with the approval of Congress and the President, eventually adopted an extensive amendment to the Compact that became effective on December 19, 1980. *Id.* Currently, the amended bi-state Compact provides a unique regulatory framework that governs many aspects of the Basin.[4] *See* Pub. Law No. 96–551, 94 Stat. 3233 (1980); N.R.S. § 277.200 *et seq.;* Cal. Gov't Code § 66801 *et seq.*

The Compact created the Tahoe Regional Planning Agency, the defendant in this lawsuit, and the Compact continues to dictate TRPA's structure, responsibilities, powers, and other rules and requirements, as we will now discuss in greater detail.

## C. The Compact's Findings and Declarations of Policy

Article I of the Compact makes various findings and declarations of policy, many of which are pertinent to the resolution of this lawsuit. (Compact, Art. I(a).) Among other things, the findings and declarations of policy detail the public and private interests in protecting and enhancing the values of the Basin as well as the National and State interests in preserving environmental and recreational values. Article I of the Compact gives context to the need for TRPA's creation and brings a sense of purpose to TRPA, and a proper under-

---

dispute in order to provide background on the Lake Tahoe Basin. Fed.R.Evid. 201.

**4.** Pursuant to our order (# 73), we take judicial notice of the Compact.

standing of Article I is important to interpreting and administering the Compact. Specifically, Article I of the Compact states:

## ARTICLE I. FINDINGS AND DECLARATIONS OF POLICY

(a) It is found and declared that:

(1) The waters of Lake Tahoe and other resources of the region are threatened with deterioration or degeneration, which endangers the natural beauty and economic productivity of the region.

(2) The public and private interests and investments in the region are substantial.

(3) The region exhibits unique environmental and ecological values which are irreplaceable.

(4) By virtue of the special conditions and circumstances of the region's natural ecology, development pattern, population distributions and human needs, the region is experiencing problems of resource use and deficiencies of environmental control.

(5) Increasing urbanization is threatening the ecological values of the region and threatening the public opportunities for use of the public lands.

(6) Maintenance of the social and economic health of the region depends on maintaining the significant scenic, recreational, educational, scientific, natural public health values provided by the Lake Tahoe Basin.

(7) There is a public interest in protecting, preserving and enhancing these values for the residents of the region and for visitors to the region.

(8) Responsibilities for providing recreational and scientific opportunities, preserving scenic and natural areas, and safeguarding the public who live, work and play in or visit the region are divided among local governments, regional agencies, the States of California and Nevada, and the Federal Government.

(9) In recognition of the public investment and multi-state and national significance of the recreational values, the Federal Government has an interest in the acquisition of recreational property and the management of resources in the region to preserve environmental and recreational values, and the Federal Government should assist the States in fulfilling their responsibilities.

(10) In order to preserve the scenic beauty and outdoor recreational opportunities of the region, there is a need to insure an equilibrium between the region's natural endowment and its manmade environment.

(b) In order to enhance the efficiency and governmental effectiveness of the region, it is imperative that there be established a Tahoe Regional Planning Agency with the powers conferred by this compact including the power to establish environmental threshold carrying capacities and to adopt and enforce a regional plan and implementing ordinances which will achieve and maintain such capacities while providing opportunities for orderly growth and development consistent with such capacities.

(c) The Tahoe Regional Planning Agency shall interpret and administer its plans, ordinances, rules and regulations in accordance with the provisions of this compact.

(Compact, Art. I.)

These findings and declarations of policy guide TRPA in interpreting and administering its plans. However, as described in our oral order (# 77), these findings and declarations of policy do not give rise to substantive obligations on the part of TRPA.

## D. Environmental Threshold Carrying Capacities

The Compact defines an "[e]nvironmental threshold carrying capacity" as "an environmental standard necessary to maintain a significant *scenic*, recreational, educational, scientific or natural value of the region or to maintain public health and safety within the region." (Compact, Art. II(i) (emphasis added).) TRPA not only has the *power* to establish environmental threshold carrying capacities, (*Id.* at Art. I(b)), but the Compact actually *mandates* that TRPA "shall develop ... environmental threshold carrying capacities for the region" within 18 months after the effective date of the amendments to the Compact. (*Id.* at Art. V(b).)

TRPA adopted three environmental threshold carrying capacities addressing scenic concerns ("scenic thresholds") in 1982 and an additional scenic threshold in 1993. (Resolution 82–11, Def.'s Req. for Judicial Notice ("RJN"), Ex. 1 at A–10.; Ordinance 93–14, Def.'s RJN, Ex. 5.) Each scenic threshold addresses different elements of scenic quality, including: (SR–1) the quality of scenic resources from viewpoints along major roadways in the Basin and from the Lake towards shore; (SR–2) the quality of specific views of scenic features of the Basin's natural landscape that can be seen from major roadways and the Lake; (SR–3) the "viewshed" from public recreation areas and certain bicycle trails; and (SR–4) the design standards and guidelines for the built environment to produce built environments compatible with the natural, scenic, and recreational values of the region. (Resolution 82–11, Def.'s RJN, Ex. 1 at A–10; Ordinance 93–14, Def.'s RJN, Ex. 5; Def.'s RJN, Ex. 7, Ch. 8 at 1–2.)

SR–1, which was adopted in 1982, is of particular concern to this lawsuit because the Scenic Review Ordinance, which is primarily aimed at regulating views from the Lake towards shore, is designed to attain SR–1. (Resolution 82–11, Def.'s RJN, Ex. 1 at A–10.) SR–4, also adopted in 1982, is also of concern because it expresses the policy of TRPA to produce built environments—including elements of height, bulk, texture, form, materials, colors, lighting, and other design elements of new, remodeled and redeveloped buildings—compatible with the natural, scenic, and recreational values of the region. (*Id.*)

## E. The Regional Plan & Implementing Ordinances

The Compact authorizes TRPA "to adopt and enforce a regional plan and implementing ordinances which will achieve" any adopted environmental threshold carrying capacities. (Compact, Art. I(b).) Under the Compact's mandate, the regional plan ("Regional Plan") "shall be a single enforceable plan" and includes many correlated elements relating to the regulation of the Basin, including "[a] conservation plan for the preservation, development, utilization, and management of the *scenic* and other natural resources within the basin, including but not limited to soils, shoreline and submerged lands, scenic corridors along transportation routes, open spaces, recreational and historical facilities." (*Id.* at Art. V(c)(3) (emphasis added).) However, if TRPA adopts new environmental threshold carrying capacities, including scenic thresholds, the Compact dictates that TRPA "shall amend the regional plan so that, at a minimum, the plan and all its elements, as implemented through agency ordinances, rules and regulations, achieves and maintains the adopted environmental threshold carrying capacities." (*Id.* at Art. V(c).)

TRPA adopted its current Regional Plan for the Basin in 1987. TRPA has also adopted implementing ordinances and rules and regulations ("Code of Ordi-

nances" or "Code" and "Rules of Procedure") in accordance with the Compact. (Def.'s RJN, Ex. 2.)

## F. Threshold Evaluation Reports

Section 32.8 of the Code of Ordinances directs that "TRPA shall prepare periodic reports on the attainment and maintenance of thresholds and standards" every five years. (Code § 32.8, Def.'s RJN, Ex. 2.) TRPA prepared and issued three such reports (in 1991, 1996, and 2001), which are known as threshold evaluation reports ("Threshold Evaluation Reports"). (Def.'s RJN, Exs. 3, 4, 6.) According to the Code, the Threshold Evaluation Reports "shall include, at a minimum[,][a] report on the amount and rate of actual progress toward threshold and standard attainment contributed by each compliance measure." (Code § 32.8.A(1), Def.'s RJN, Ex. 2.) TRPA's Threshold Evaluation Reports include summaries, in the form of "environmental threshold compliance forms," of information required by Code Section 32.8 for each threshold. (*See, e.g.,* Def.'s RJN, Ex. 7, Ch. 8, 23–24.) Under the Code, the Threshold Evaluation Report also must include a report on the cumulative impacts on each threshold of projects approved by TRPA, a report on the extent to which the Basin is making progress towards achieving each threshold, and recommendations for implementation of supplemental compliance measures to ensure progress towards attainment. (Code § 32.8.A(2)—(5), Def.'s RJN, Ex. 2.)

TRPA staff prepares the Threshold Evaluation Reports and submits them to the Governing Board ("Board"). The Board reviews the Threshold Evaluation Reports for completeness and issues the reports to the public through passing a Resolution. (Def.'s RJN, Exs. 3, 4, 6.)

## G. The Scenic Review Ordinance

The Scenic Review Ordinance requires certain residential projects in shoreland or littoral parcels to meet certain criteria in order to obtain TRPA approval. The Scenic Review Ordinance includes different levels of review depending on the extent of the project (no review for repair and maintenance; extensive review for new houses), and different options for compliance (basic mitigation standards, visual magnitude system, or an independent review). The Scenic Review Ordinance encompasses three major components to achieve these different levels of review and present various options for residential design: Design Standards, Contrast Rating/Visual Magnitude Rating System, and different Levels of Review. (Def.'s RJN, Ex. 15 at 116.)

### 1. Design standards

Design standards are architectural techniques that can reduce the overall contrast of the built environment. (*Id.*) TRPA had previously adopted design standards and the proposed amendments relate to color, setbacks, and glass. (*Id.*) We were unable to determine from the judicially noticed documents whether TRPA adopted the proposed amendments with respect to setbacks and glass, but the Scenic Review Ordinance does factor in setbacks and glass. (Code §§ 30.15.C(4)(a)(iii), 30.15.C(5)(a)(ii), Def.'s RJN, Ex. 12; Visual Magnitude System, Def.'s RJN, Ex. 17, App. H–1.) It is apparent that TRPA adopted design standards relating to color. (Code § 30.6.A(3), Def.'s RJN, Ex. 12, Ch. 30 at 2.)

### 2. Contrast Rating/Visual Magnitude

The contrast rating/visual magnitude rating procedure involves a complex rating of a proposed structure based on various factors—screening, color, the exterior surface's pattern/texture, and the number of planes/degree of articulation—to determine the structures' contrast with the natural environment. (Def.'s RJN, Ex. 17,

App. H–1.) The rating procedure computes an overall score, which corresponds to the amount of visible square footage allowed. (*Id.* at H–3.) Projects that blend in with the natural environment are intended to result in high scores, and projects that contrast with the environment should result in low scores. (*Id.* at H–2.) A high rating score translates into a greater allowance for square footage; conversely, a low score translates into a very small allowance for visible square footage. (*Id.* at H–3.)

Factors that increase a project's score include (1) various shades of dark/flat or medium dark surfaces,[5] (2) projects with many visible planes composed of rock masonry, logs, boards, composite shingle, and shake roof, and (3) a low percentage of visible structure as seen from 300 feet offshore. (*Id.* at H–1 to H–3.) Factors that decrease a project's score include light/gloss (including glass) surfaces, flat box-like, warehouse-type structures with no visual breaks, and a high percentage of visible structure. (*Id.* at H–1 to H–3.) A perfect score of 35 allows up to 3300 visible square feet. (*Id.* at H–3.) The lowest score of 3 allows for only 55 square feet. (*Id.*)

### 3. Levels of Review

TRPA's best argument in support of the Scenic Review Ordinance is its allowance of different levels of review. TRPA argues that this will allow for the streamlining of basic projects with little scenic impact, while allowing for more in-depth and objective treatment of projects that will have a greater impact. To streamline smaller projects, the ordinance exempts normal repair and maintenance (excluding painting or anything that affects color), as well as in-kind replacement. (Code §§ 4.2.A, 30.15.C(1), Def.'s RJN, Ex. 12.)

If a homeowner, seeks a permit for a more extensive project, there are three basic options for obtaining a permit in the shoreland. Under the "Standard Option," as TRPA calls it, a permit applicant must show that her project meets a minimum visual contrast rating score through scenic best management practices ("BMPs") and other standards (setback, visible facade, height limits, etc.) depending on the specifics of the project. (*Id.* at § 30.15.C(3), (4)(a), (5)(a).) Under the "Visual Magnitude Option," applicants can design their structures to include visual breaks and to meet a given color contrast score for a desirable visible facade square footage. (*Id.* at § 30.15.C(4)(b), (5)(b).) Finally, the applicant or TRPA staff may elect to initiate an independent review. (*Id.* at § 30.15.E.) The independent review may employ an independent expert employing TRPA's methodology (*Id.* at § 30.15.E(1)) or a scenic review panel composed of one member of TRPA's choice, one member of

---

**5.** We take judicial notice of Appendix G to the Scenic Review Ordinance (the Munsell color scale and TRPA approved colors), which can be accessed at *http://www.trpa.org/Scenic/DRG.pdf*. The Munsell color scale is based upon three values—hue (relation to red, yellow, green, blue, purple), value (lightness), and chroma (strength). TRPA recommends colors on the Munsell scale that approximates soils and plant tissue color. (Design Review Guidelines, App. G–1.) Under the Scenic Review Ordinance, painting in TRPA approved colors (value and chroma of 0–4 on the Munsell scale) is an exempt activity. (Code § 30.15.C(2), Def.'s RJN, Ex. 12.) Painting in non-recommended colors on the Munsell scale triggers review under one of the six levels of review depending on the specifics of the project (likely level 3 review requiring implementation of scenic best management practices). (*Id.* at 30.15.C(3).) Painting in non-recommended colors could also result in the review of the project under the color contrast rating procedure, which would determine the percentage of allowable visible square footage. (*Id.* at § 30.15.C(4)(b), (5)(b); App. H, Def.'s RJN, Ex. 17.)

applicant's choice, and one member chosen by the two panel members. (*Id.* at § 30.15.E(2).) The applicant can elect a panel until November 20, 2004, unless further extended by TRPA, and the panel may use other professionally accepted methods of evaluating scenic impacts. (*Id.*)

## II. PROCEDURAL BACKGROUND OF THIS LAWSUIT

### A. Resolutions 02–18 and 02–21

This lawsuit arises out of two TRPA Board actions, which the Committee claims are in violation of the Compact. The first Board action took place at TRPA's July 24, 2002, Board Meeting. At this meeting, TRPA proposed and adopted Resolution 02–18 ("02–18"), which issued the 2001 Threshold Evaluation Report (2001 "Threshold Report" or "Report"). While the 2001 Threshold Report noted a general improvement in the scenic quality of commercial districts, the Report identified a dramatic increase in the pace of residential redevelopment and the resulting dramatic loss of scenic quality. (Def.'s RJN, Ex. 7, Ch. 8 at 12–13.) The 2001 Threshold Report listed several factors as matters of scenic concern for TRPA, including an in-crease in the scale and mass of residential structures, the proximity of structures to the lake, the increased visibility of structures, and the unauthorized removal of trees and other vegetation. (*Id.* at 12–14.) The 2001 Threshold Report also recommended the implementation of a new and, from the Committee's perspective, unnecessary and unauthorized scenic review system. (*Id.* at 61–63 & App. 2.)

On July 26, 2002, two days after the July 24, 2002, TRPA Board Meeting, various concerned members of the community formed the Committee.[6] The Committee then entered into a tolling agreement with TRPA, whereby the statute of limitations in Article VI(j)(4) of the Compact would be tolled with respect to Resolution 02–18 until October 30, 2002. (Pl.'s RJN, attached to Pl.'s Oppo. (# 29), Ex. 2.) On October 22, 2002, the Committee filed its complaint (# 2), which alleged eight claims for relief arising out of the July 24, 2002, TRPA Board Meeting, TRPA's adoption of Resolution 02–18 and TRPA's issuance of the 2001 Threshold Report.[7]

On November 20, 2002, after providing general notice to the public, TRPA conducted another Board Meeting and public

---

**6.** It is unclear from the face of the complaint whether or not the Committee's members actually own property that stands to be affected by the scenic review system. The complaint does allege that "actions of defendant TRPA has [sic] damaged plaintiff's property interests." (Compl., ¶ 64.) However, this allegation was made with respect to the recommendations in the 2001 Threshold Report and prior to the adoption of Resolution 02–21, which adopted the recommendations with respect to shoreland and littoral properties. It is unclear whether plaintiff's members own littoral or shoreland properties, other non-lakefront Basin property, or any property at all. However, taking all favorable inferences from the complaint and the liberal notice pleading requirements of Rule 8 of the Federal Rules of Civil Procedure, we find this allegation sufficient to establish that at least some of plaintiff's members own affected shoreland property and could suffer an injury in fact from enactment of the Scenic Review Ordinance.

**7.** The Committee's eight claims for relief include: (1) Violation of TRPA Compact—Lack of Authority; (2) Violation of TRPA Compact—Lack of Scientific Evidence and Technical Information; (3) Violation of TRPA Compact—Failure to Seek Equilibrium Between Man and Nature; (4) Failure to Prepare an Environmental Impact Statement; (5) Violation of Administrative Procedure Act; (6) The July 24, 2002, TRPA Governing Board Action; (7) Federal Civil Rights Violations, including takings under the Fifth and Fourteenth Amendments, equal protection, and procedural and substantive due process; and (8) Declaratory Relief.

hearing. (Def.'s RJN, Exs. 9–11.) At the Board Meeting, TRPA considered, amended, and adopted the Scenic Review Ordinance through the issuance of Resolution 02–21 ("02–21"). As amended and adopted, the Scenic Review Ordinance applies only to shoreland or littoral parcels—those within 300 feet of the high water mark of the Lake. (Def.'s RJN, Ex. 12, Ch. 2 at 1.)

The Committee filed a supplemental amendment (# 9) to the complaint, which incorporated the claims for relief asserted against 02–18 and asserted the same claims for relief against 02–21. The supplemental amendment to the complaint also asserted claims that the Board's actions in issuing both 02–18 and 02–21 violated the separation of powers doctrine, that the Scenic Review Ordinance and 02–18 are arbitrary, vague, and ambiguous, and that the Scenic Review Ordinance and 02–18 constitute violations of the First Amendment right to freedom of speech and expression and of political speech.

### B. The Hearing and Our Oral Decision

We conducted a hearing on February 19, 2004, and issued an oral decision from the bench dismissing certain claims on February 20, 2004. In our oral decision, we granted defendant's motion to dismiss plaintiff's first through eighth claims for relief for lack of standing because plaintiff failed to properly allege a concrete and particularized injury in fact arising from the issuance of 02–18. We also granted the motion to dismiss with respect to claim nine insofar as it addressed 02–18 because 02–18 merely issued the 2001 Threshold Report and did not cause an injury in fact to plaintiff's members. We also granted defendant's motion to dismiss with respect to claim nine insofar as it alleged (1) Lack of Scientific Evidence and Technical Information, (2) Failure to Seek an Equilibrium Between Man and Nature, (3) Failure to Prepare an Economic Impact Study or

Consider Feasibility, (4) Violation of the Administrative Procedure Act, (5) Separation of Powers violation, and (6) civil rights claims for violations of procedural due process, substantive due process, and equal protection.

### C. Plaintiff's Remaining Claims

Plaintiff's remaining claims presented closer issues of law and involved a complicated interaction of the allegations of the complaint with the judicially noticed materials and facts. We concluded that these issues would be best explored in a more indepth analysis. Therefore, we now address plaintiff's remaining claims with respect to 02–21 and the Scenic Review Ordinance: (1) that TRPA lacked authority under the Compact to issue 02–21 and enact the Scenic Review Ordinance; (2) that TRPA did not make written findings on the basis of "substantial evidence;" (3) that TRPA was required to prepare an Environmental Impact Statement ("EIS"); (4) that the enactment of the Scenic Review Ordinance constitutes a taking of plaintiff's members property by TRPA under the Fifth and Fourteenth Amendments; (5) that the Scenic Review Ordinance is arbitrary, vague, and ambiguous; and (6) that the Scenic Review Ordinance violates the First Amendment right to freedom of speech and expression and of political speech.

### III. STANDARDS FOR MOTION TO DISMISS

Dismissal for failure to state a claim is proper only if it is beyond doubt that plaintiff can prove no set of facts in support of his claim that would entitle plaintiff to relief. *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1149 (9th Cir.2000). The review is limited to the complaint, and all allegations of material fact are taken as true and viewed in the light most favorable

to the non-moving party. *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996). However, although courts generally assume the facts alleged are true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations." *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

While review is limited to the contents of the complaint, if matters outside the pleadings are submitted, the motion to dismiss may be treated as one for summary judgment if the district court relies on the materials. *Anderson v. Angelone*, 86 F.3d 932, 934 (9th Cir.1996); *Allarcom Pay Television, Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 385 (9th Cir.1995). However, a court may consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003).

On a motion to dismiss, "we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (alteration in original). However, conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss. *In re Stac Elecs.*, 89 F.3d at 1403.

## IV. ANALYSIS

### A. Claim One: TRPA Lacked Authority under the Compact [8]

The Committee claims that TRPA lacked authority under the Compact to enact the Scenic Review Ordinance.[9] Specifically, the Committee alleges,(1) that TRPA's justification for the Scenic Review Ordinance is a result of problems that TRPA itself has caused by approving projects in the past, (2) that land use decisions such as those relating to building and roofing colors and materials are within the sole jurisdiction of local governments and that TRPA failed to coordinate with the local governments, and (3) that TRPA has intruded upon the exclusive jurisdiction of local, state, and federal agencies responsible for fire and safety protection. (Compl., ¶¶ 21–27.)

The Compact limits the scope of our judicial inquiry into TRPA's authority to implement the Scenic Review Ordinance to questions of whether the act or decision was arbitrary, capricious or lacking in substantial evidentiary support or whether TRPA failed to proceed in a manner required by law. (Compact, Art. VI(j)(5).) The Committee's lack of authority argument appears to be best characterized as an allegation that TRPA failed to proceed in a manner required by law.

#### 1. Faulty Justification

The Committee argues that "the 'problems' TRPA cites to justify its adoption of the [Scenic Review Ordinance] at Lake Tahoe are a result of its own inconsistent

8. For convenience, we will address the plaintiff's remaining claims according to the numbering in part II(C) of this order. Since all of the claims are brought under the Ninth Claim for Relief, these numbers do not necessarily correspond to the complaint. Likewise, the ordering does not reflect on the importance of the issues.

9. The portion of the Committee's complaint regarding lack of authority (First Claim incorporated into Ninth Claim) makes arguments that have already been rejected by the court in our oral decision or that relate to other claims such as takings. (*See* Compl., ¶¶ 26–27.) Only the non-dismissed portions of this claim relating to lack of authority will be addressed here.

application of its Compact, TRPA's Code of Ordinance, TRPA's Rules of Procedure, regional plan, and its standard practices and procedures." (Compl., ¶ 23.) Essentially, the Committee appears to be arguing that TRPA caused this problem and, therefore, does not have "lawful justification for implementing new extreme regulations." (*Id.*)

█ The Committee's argument in this respect is itself faulty. First, the Compact mandates that TRPA "shall continuously review and maintain the regional plan." (Compact, Art. V(c).) The Regional Plan includes a "conservation plan for the preservation, development, utilization, and management of the *scenic* and other natural resources within the basin." (*Id.* at Art. V(c)(3).) Therefore, contrary to the Committee's assertion that TRPA did not have authority to regulate the scenic quality in the Basin, TRPA is under an affirmative duty to maintain and review the regional plan, which includes the maintenance and preservation of scenic resources. (*See id.* at Art. V(c), Art. V(c)(3).) The fact that TRPA might have contributed to the deteriorating scenic quality through under-inclusive ordinances or by "acquiescing to powerful and influential individuals and groups" (Compl., § 23.) does not alter TRPA's mandate under the Compact to continuously assess and preserve the scenic resources of the basin. (Compact, Art. V(c).)

Second, the 2001 Threshold Report made specific findings addressing the need for a new scenic review system. While the 2001 Threshold Report supports the Committee's allegations that TRPA has failed to properly enforce its pre-existing scenic review, the Report also notes that the "1991 and 1996 [Threshold] Evaluations identified Code deficiencies related to design criteria (height, setback, color, etc.) and use of unclear and inappropriate sce-

nic assessment methodology as contributing to lack of threshold attainment." (Def.'s RJN, Ex. 7, Ch. 8 at 16; *See* Def.'s RJN, Ex. 15, at 123 ("TRPA sampling estimates that 10–15% of the problem is insufficient enforcement" of existing scenic conditions of approval).) TRPA also found that, at the time, the current qualitative approach "result[ed] in subjectivity and many hours spent debating or compromising on scenic mitigation measures." (Def.'s RJN, Ex. 16, at 75.)

Therefore, it is apparent that TRPA noted deficiencies in both its methodology and ordinances, and the Scenic Review Ordinance represents an attempt to rectify those problems. (*See* Def.'s Resp. (# 74), Ex. A at 5 ("[I]t is appropriate that [TRPA] apply the precautionary principle in eliminating/replacing procedures which have permitted further decline, and instituting firm actions to improve existing conditions.").) Despite the fact that TRPA's failures might have contributed to the degradation in scenic quality, it was under a duty imposed by the Compact to correct these problems by assessing the Regional Plan and adopting new ordinances to seek attainment of the thresholds.

Plaintiff's theory that TRPA is precluded from regulating a subject area because its prior regulations failed would divest TRPA of most of its authority as, according to the 2001 Threshold Report, TRPA is out of attainment on 70 percent of its thresholds (25 out of 36). (Def.'s RJN, Ex. 7 at xvii.) Imposing these adverse consequences on agencies for past failures would greatly inhibit sound agency decision making because agencies might refrain from taking action if such action could result in a loss of authority in a particular subject matter. The agency might not undertake projects with a less than 100% probability of success even if the expected net benefit was positive.[10]

---

10. For example, a project might have a 70% chance of success, which would result in a

Furthermore, this would lead to the absurd result that the areas in most need of agency attention—the areas which are in non-compliance—are the areas in which the agency is divested of authority to regulate. Therefore, it is clear that TRPA's history of failure in this area does not divest it of regulatory authority and defendant's motion to dismiss should be granted with respect to this claim.

## 2. Land Use Decisions are Local in Nature

The Committee also argues that "[l]and use decisions such as those relating to building and roofing colors and materials are within the sole jurisdiction of local government at Lake Tahoe." (Compl., ¶ 24.) As outlined above, the Compact mandates that TRPA shall develop a regional plan which shall include a "conservation plan for the preservation, development, utilization, and management of the *scenic* and other natural resources within the basin." (Compact, Art. V(c)(3) (emphasis added).) In fact, the Compact grants TRPA the power to establish "environmental threshold carrying capacities," which specifically includes an "environmental standard necessary to maintain a significant *scenic*" value of the region. (*Id.* at Art. I(b), II(i) (emphasis added).)

The Compact's findings support the interpretation that TRPA has the authority to maintain the "significant *scenic*" values provided by the Basin. (*Id.* at Art. I(a)(6)

(emphasis added).) The fact that the Compact specifically mentions scenic resources and values, and actually mandates that TRPA protect such scenic resources, suggests that such a problem does in fact represent a regional problem. *See People ex rel. Younger v. County of El Dorado*, 5 Cal.3d 480, 96 Cal.Rptr. 553, 487 P.2d 1193, 1201 (1971) ("Indeed, the fact that the Compact is the product of the cooperative efforts and mutual agreement of two states is impressive proof that its subject matter and objectives are of regional rather than local concern."). Furthermore, the California Supreme Court noted in *Younger* that land-use planning and environmental control often present problems of regional, statewide, national, or even world-wide concern. *Id.* at 1204 n. 20.

Therefore, the Scenic Review Ordinance is within TRPA's authority under the Compact because it addresses a problem of regional concern: the scenic quality of littoral and shoreland properties around the entire Lake. (*See* Compact, Art. VI(a) ("Whenever possible ... the ordinances, rules, regulations, and policies shall be confined to matters which are general and regional in application ....").) The Scenic Review Ordinance is general and regional in nature as it applies to *all* littoral and shoreland properties in the Basin. Furthermore, local jurisdictions would likely be unable to coordinate this extensive of a regulatory scheme in order to mitigate the scenic impact of residential housing along the lakefront area.[11]

---

benefit of 10,000 utility points. The failure of the project might result in a negative 10,000 utility points in wasted resources, time, and other factors. Although the project has a net expected benefit of 4,000 utility points ((.70 X 10,000)—(.30 X 10,000)), the imposition of the additional cost on the agency in the form of lost authority will alter their objective decision making. Although a project would result in an expected net benefit in the agency's field of regulation, the agency might not undertake this project out of fear of failure and the cost associated with its lost authority.

**11.** In fact, it seems likely that, in the absence of regional regulation of land use, local jurisdictions would have incentives to "free ride" on other jurisdictions' attempts to improve scenic quality. These "free-riding" jurisdictions could capture the benefit of increased regulation by certain jurisdictions without incurring any of the associated costs. Regional regulation ensures that the costs as well the benefits are borne by all jurisdictions.

We note that local jurisdictions retain jurisdiction over land use decisions, but their power is not absolute. Local jurisdictions have the power to "adopt and enforce an equal or higher requirement applicable to the same subject of regulation in its territory." (*Id.* at Art. VI(a).) Therefore, plaintiff's argument that local jurisdictions retain sole jurisdiction over scenic quality matters, such as land use, is without merit.

The Compact specifies that in formulating and implementing the regional plan TRPA "shall seek the cooperation and consider the recommendations of" local government, State and Federal agencies, other educational institutions and research organizations. (Compact, Art. V(i); *see also* SR–4, Def.'s RJN, Ex. 2 at A–10 ("It shall be the policy of the TRPA Governing Board in development of the Regional Plan, *in cooperation with local jurisdictions*, to insure the height, bulk, texture, form, materials, colors ... and other design elements of new, remodeled and redeveloped buildings be compatible with the natural, scenic, and recreational values of the region.") (emphasis added).) The Committee's complaint does not allege that TRPA failed to coordinate, cooperate, or consider the recommendations of local governments. The Committee's complaint simply alleges that TRPA is usurping local authority and that the Compact requires TRPA to "coordinate with local government." Although the complaint alleges that TRPA had a duty to coordinate, the complaint does not allege that TRPA actually failed to comply with this aspect of the Compact.

Furthermore, even if the Committee is arguing that TRPA had to coordinate with local government, such a claim is foreclosed by the judicially noticed record. Representatives of city and county governments sit on TRPA's Advisory Planning Commission (Compact, Art. III(h)) and its Governing Board (*Id.* at Art. III(a)), both of which participated in hearings. (*See,* Def.'s RJN, Ex. 15 at 116 (noting Advisory Planning Commission's reception of public comments and its recommendation to approve the Scenic Review Ordinance).) Six of the fifteen Governing Board members are representatives from local cities (2) and counties (4). (Compact, Art. III(a).) In short, even if the Committee's complaint adequately stated noncompliance with the Compact in this respect, there is substantial evidence that TRPA cooperated and considered the recommendations of local governments.

### 3. Intrusion Upon the Jurisdiction of Fire Protection and Safety

The Committee also alleges that the Scenic Review Ordinance's requirements for landscaping and screening will create a fire hazard, thereby intruding upon the jurisdiction of local, state, and federal agencies responsible for fire protection and safety.

As previously discussed, the Compact grants TRPA the authority to enact ordinances regulating land use decisions that are of regional concern. This authority includes decisions relating to landscaping and screening. The Scenic Review Ordinance mitigates any possible fire danger by including a clause that "[t]he applicant shall not submit vegetative screening inconsistent with local fire protection standards." (Code § 30.15.D(3), Def.'s RJN, Ex. 2.)

The Scenic Review Ordinance does not interfere with local fire protection standards because it includes a clause that specifically incorporates local fire standards. Land use decisions such as those regulated by the Scenic Review Ordinance are within the jurisdiction of TRPA. Even if the jurisdiction of TRPA and other agencies responsible for fire and safety protec-

tion interact or are co-extensive, this does not deprive TRPA jurisdiction or authority to implement the Scenic Review Ordinance, especially since the ordinance specifically incorporates local fire protection standards. Therefore, plaintiff's claim that TRPA exceeded its authority by regulating areas that are within the exclusive jurisdiction of fire safety and protection agencies must be dismissed.

The Committee also argues that TRPA failed to seek comments from local, state, and federal agencies responsible for fire protection and safety. We construe this as an assertion that TRPA failed to "proceed in a manner required by law." (*See* Compact, Art. VI(j)(5).) Contrary to the assertions of the complaint, it is unclear that TRPA is under a duty to consult with local, state and federal fire protection and safety agencies because we could find no such duty in the Code. (*But see id.* at Art. V(I) ("In formulating and implementing the regional plan, [TRPA] shall seek the cooperation and consider the recommendations of counties and cities and other agencies of local government, of State and Federal agencies . . . .").)

To the extent that TRPA is under such a duty, it is apparent from the judicially noticed record that TRPA did in fact consult with local fire agencies.[12] (Def.'s RJN, Ex. 13, Attach. F at 225.) Furthermore, TRPA did consider fire danger in its Initial Environmental Checklist, albeit in, a cursory fashion, by marking a box that the project would not result in an unplanned effect on fire protection. (*See* Environmental Checklist Form, Def.'s RJN, Ex. 13 at 11.) Notwithstanding plaintiff's

allegation in the complaint, it appears from the judicially noticed record that TRPA did consult and seek comments from local, state and federal agencies responsible for fire protection and safety and this is supported by evidence in the judicially noticed record.

## B. Claim Two: TRPA's Decisions Were Arbitrary, Capricious, and Lacked "Substantial Evidentiary" Support

The Committee alleges various flaws or gaps in TRPA's evidence as justification for implementing the Scenic Review Ordinance, including the lack of scientific or technical information. However, as addressed below, the Compact permits challenges to TRPA's actions that lack "substantial evidentiary" support.[13] Therefore, we now address whether TRPA based its decision on the basis of substantial evidence.

### 1. TRPA's duty under its Compact and Code

Under the Compact, TRPA is required to make written findings on the basis of *substantial evidence* in the record that the project is consistent with applicable plans, ordinances, regulations, and standards of Federal and State agencies relating to the protection, maintenance and enhancement of environmental quality in the region." (Compact, Art. VI(b) (emphasis added).) Although Article VI(b) of the Compact applied until TRPA adopted ordinances prescribing specific written findings that the agency is required to make prior to approving a project in the region,

---

12. We noted in our order (# 73) taking judicial notice of certain documents that we were not taking judicial notice of the truth of facts not capable of accurate and ready determination. However, we also stated that we were taking judicial notice that findings, reports or resolutions were made. In this respect, the fact that TRPA made a finding that it consult-

ed with fire and safety agencies is properly subject to judicial notice.

13. In our oral decision (# 77), we dismissed the claim that TRPA was required to produce scientific or technical information to justify the Scenic Review Ordinance.

TRPA also adopted the "substantial evidence" standard in its ordinances. (Code § 6.2.A, Def.'s RJN, Ex. 2 at Ch. 6 ("All required findings shall be in writing and shall be supported by *substantial evidence* in the record of review.") (emphasis added); Compact, Art. V(g).) Furthermore, under Article VI(j)(5), the scope of judicial review of legislative acts or decisions of TRPA extends only to questions of whether the act or decision was "arbitrary, capricious or *lacking substantial evidentiary support* or whether the agency has failed to proceed in a manner required by law." [14] (Compact, Art. VI(j)(5) (emphasis added).)

TRPA adopted ordinances, located in Chapter 6 of the Code, that outline the findings required before taking certain actions. (Def.'s RJN, Ex. 2, Ch. 6 at 1.) The Code requires that all findings "shall be in writing and shall be supported by *substantial evidence* in the record of review." (Code § 6.2.A, Def.'s RJN, Ex. 2, Ch. 6 at 1 (emphasis added).) The required findings "shall be accompanied by a brief statement of the facts and rationales upon which they are based." (*Id.* at § 6.2.B.)

Before approving any amendment or adoption of the Code, Rules, or other plans which implement the Regional Plan, Code Section 6.5 mandates that TRPA must find "that the Regional Plan and all of its elements, as implemented through the Code, Rules and other TRPA plans and programs, as amended, achieves and maintains the thresholds." (*Id.* at § 6.5.) With respect to the Regional Plan, Code Section 6.4 likewise requires that TRPA must find that the Regional Plan, as amended, achieves and maintains the thresholds. Section 6.3 of the Code specifies the "Threshold–Related Findings" that TRPA must make in order to satisfy its obligation under Code § 6.5.Code Section 6.3.A details three particular findings that TRPA must make in order to approve any amendment or adoption of the Code, Rules or other TRPA plans and programs which implement the Regional Plan:

(1) The project is consistent with, and will not adversely affect implementation of the Regional Plan, including all applicable Goals and Policies, plan area statements and maps, the Code and other TRPA plans and programs, [sic]

(2) The project will not cause the environmental threshold carrying capacities thresholds to be exceeded; and

(3) Wherever federal, state or local air and water quality standards applicable for the region, whichever are strictest, must be attained and maintained pursuant to Article V(d) of the Tahoe Regional Planning Compact, the project meets or exceeds such standards.

(*Id.* at § 6.3.A.)

### 2. The meaning of "substantial evidence"

The deferential "substantial evidence" standard of review is common in judicial review of agency decisions. *Aegerter v. City of Delafield,* 174 F.3d 886, 889 (7th Cir.1999). Courts have construed substantial evidence to mean "less than a preponderance, but more than a scintilla of evidence." *Cellular Tele. Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 (2d Cir. 1999). In making this determination, a court views the entire record to see if it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Universal Camera v. Nat. Labor Relations Bd.,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

Under the Telecommunications Act, substantial evidence may take the form of

---

14. We previously addressed whether TRPA proceeded in a manner required by law in Section IV(A) of this order.

aesthetic information and judgment as long as it is apparent that aesthetic judgment is not a pretext for a particular decision. *Sprint Spectrum L.P. v. Bd. of Zoning Appeals of the Town of Brookhaven,* 244 F.Supp.2d 108, 114 (E.D.N.Y.2003) ("[C]ourts need not look far beyond a local board's citing of aesthetics to find a valid basis for a local zoning decision ....") (quoting *Cellular Tele. Co.,* 166 F.3d at 495) (internal brackets omitted). Likewise, under the Compact, we find that aesthetic information and judgment may constitute "substantial evidence."

### 3. The Scenic Review Ordinance is based on substantial evidence

It is apparent from the judicially noticed record that TRPA made the findings required by the Code and the Compact. (*See* October 16, 2002 Memo—Agenda Item IX.A, Def.'s RJN, Ex. 15 at 124–26 (citing 2001 Threshold Report, Def.'s RJN, Ex. 7); *see also* November 12, 2002 Memo—Agenda Item VII.B, Def.'s RJN, Ex. 16 at 75–77.) Furthermore, it is clear from the judicially noticed record that such findings were based on substantial evidence because the findings contain relevant evidence that a reasonable mind might accept as adequate to support their conclusion.[15] Of primary significance, the 2001 Threshold Report extensively documented the problem—the ineffectiveness of the previous scenic measures and the negative trend in the decline in scenic quality—and the need for a different approach to scenic quality—the Scenic Review Ordinance.

Therefore, under this deferential standard of review, it is clear that, although the Committee does not agree with TRPA's approach, TRPA made the required findings under the Compact and the Code and TRPA's decision was based on the consideration of substantial evidence. (*See* Def.'s RJN, Ex. 15, Agenda Item IX.A, at 124–25 (making the required findings and citing the 2001 Threshold Report as support for such findings).) The 2001 Threshold Report provides the "substantial evidence" by carefully detailing "an alarming negative trend" in the increase in visibility of residential structures, particularly in the shoreline units. (Def.'s RJN, Ex. 7, Ch. 8 at 14.) The 2001 Threshold Report describes specific features of the new and remodeled projects that are contributing to increased visibility and associated loss of scenic quality, including an increase in scale and mass of residential structures, reduction in structure setback, architectural features that increase visibility, and unauthorized removal of trees and vegetation. (*Id.*) The 2001 Threshold Report also identifies that the degradation of the scenic quality resulted from inadequate scenic assessment and TRPA permit conditions. (*Id.*) The 2001 Threshold Report also recognizes that the "1991 and 1996 Threshold Evaluations identified Code deficiencies related to design criteria (height, setback, color, etc.) and [the] use of unclear and inappropriate scenic assessment methodology as contributing to the lack of threshold attainment." [16] (*Id.*)

**15.** We are able to make this finding of substantial evidentiary support without reaching the truth of the judicially noticed documents. The question is not whether TRPA's adoption of the Scenic Review Ordinance is the best solution given the underlying facts, but rather whether its adoption is supported by substantial evidence such that a reasonable person could accept such as proper support for the decision to adopt the ordinance.

**16.** The 2001 Threshold Report also identifies some deficiencies in TRPA's use of its resources. Among the insufficient uses of resources noted by the 2001 Threshold Report, TRPA has little knowledge of the extent or location of scenic threshold information, TRPA's staff lacks expertise due to the highly specialized knowledge required to assess and review new projects, and TRPA has not kept the general public and design professionals

The 2001 Threshold Report represents the final straw after ten year's of fact finding, assessment, and the realization of gradual degradation. Therefore, we must dismiss plaintiff's claim that TRPA did not base its decision on substantial evidence because the adoption of the Scenic Review Ordinance is based on more than a mere scintilla of evidence of a negative visual impact and a reasonable person would accept the 2001 Threshold Report as sufficient evidence to support the conclusion that the Scenic Review Ordinance was necessary to achieve the thresholds.[17] *See Sprint Spectrum*, 244 F.Supp.2d at 114 ("[C]ourts can find that aesthetics qualify as a permissible ground for denial of a permit only if there was more tha[n] a mere scintilla of evidence before the local board on the negative visual impact.") (internal quotations, ellipsis and brackets omitted).

## C. Claim Three: TRPA Failed to Prepare an EIS

The Committee also alleges that the Compact requires TRPA to prepare an Environmental Impact Statement ("EIS") because the Scenic Review Ordinance will have a significant effect on the environment.

### 1. Requirements of an EIS under TRPA's Compact and Code

The Compact requires TRPA to prepare and to consider a detailed environmental impact statement when acting upon matters that have a "significant effect on the environment." (Compact, Art. VII(a)(2).) However, the Code requires TRPA to use either an initial environmental checklist ("IEC") or an environmental assessment ("EA") to determine if the project has a significant effect on the environment. (Code § 5.2, Def.'s RJN, Ex. 2, Ch. 5 at 1.) Based on the information submitted in the IEC and other information known to TRPA, under Code Section 5.2.B(1), TRPA can make a finding that the proposed project could not have a significant effect on the environment and can prepare a finding of no significant effect. (*Id.* at § 5.2.B(1).)

TRPA prepared an IEC and determined that there was no significant environmental impact. (Def.'s RJN, Ex. 13.) Therefore, the Code and the Compact did not require TRPA to prepare an EIS. (Code § 5.6, Def.'s RJN, Ex. 2.) The Committee's complaint does not allege facts, even if taken as true, that an EIS was required. Most of the allegations in the complaint related to the need to prepare an EIS involve conclusory allegations ("TRPA's actions will result in a direct physical change to the environment") or the requirements of the EIS if one was prepared ("TRPA failed to consider alternatives to the proposed project"). (Compl., ¶ 40(b) & (e).) Although the judicially noticed documents are not considered for the truth of the facts stated therein, plaintiff has failed to allege facts that would necessitate the preparation of an EIS or sufficient to raise a substantial question as to whether the project may cause a significant degradation of some human environmental factor.

### 2. Judicial review under the NEPA

The Ninth Circuit recently reaffirmed that, in the context of the National Envi-

---

adequately educated on the scenic thresholds. (Def.'s RJN, Ex. 7, Ch. 8 at 17.) While the Scenic Review Ordinance might not rectify these problems, the decision to implement the Scenic Review Ordinance is still supported by substantial evidence. TRPA is not required to address all of its problems at once or in the order preferred by the Committee.

**17.** Because we find that the Scenic Review Ordinance was based on substantial evidence, we also find that the decision was not arbitrary and capricious for the reasons previously set forth in section IV(B) of this order.

ronmental Protection Act ("NEPA"), "[a]n EIS *must* be prepared if substantial questions are raised as to whether a project ... *may* cause significant degradation of some human environmental factor." *Ocean Advocates v. United States Army Corps of Eng'rs,* 361 F.3d 1108, 1124 (9th Cir.2004) (quoting *Idaho Sporting Cong. v. Thomas,* 137 F.3d 1146, 1149 (9th Cir. 1998)) (internal quotations omitted). A plaintiff need not show that significant environmental effects will in fact occur because "raising substantial questions whether a project may have a significant effect" is adequate to state a claim that an EIS was required. *Id.* (quoting *Idaho Sporting,* 137 F.3d at 1150) (internal quotations omitted). However, it is unclear whether the standards for preparing an EIS under the NEPA apply to TRPA's interpretation of the Compact and its Code. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) (holding that a court "may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency.")

### 3. Was an EIS required in this case?

■ TRPA's finding of no significant environmental impact was not arbitrary or capricious and is supported by substantial evidence. The Committee's complaint does not raise a substantial question as to whether the Scenic Review Ordinance may cause significant degradation of an environmental factor. Even if "environmental impact" included significant effects on the man-made environment, TRPA likely had substantial evidence to find that no significant environmental impact would occur. (*See* Def.'s RJN, Ex. 16, Attach. E, Letter from Johnson–Perkins & Associates (discussing the limited effect of ordinance on man-made environment, including property values and views of Lake, on most projects. Only a very small percentage of

properties undergo substantial reconstruction or expansion and impact on overall value of lakefront properties should be relatively minor).) Furthermore, TRPA followed its procedure and its interpretation of its Compact and ordinances in preparing an IEC, and its finding of no significant environmental effect is based on more than a scintilla of evidence. Therefore, we must dismiss the plaintiff's claim in this respect.

### D. Claim Four: TRPA Effected a Taking of Plaintiff's Property under *Penn Central*

The Committee's fourth claim for relief asserts that the mere enactment of the Scenic Review Ordinance effects a taking of its member's property rights.

### 1. Takings Clause

■ The Takings Clause of the Fifth Amendment to the United States Constitution provides as follows: "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause is applicable to the States through the Fourteenth Amendment. *Dolan v. City of Tigard,* 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Although TRPA is not, technically speaking, a state or subdivision of a state, TRPA is clearly liable for damages for violations of the Takings Clause. *Tahoe–Sierra Pres. Council,* 34 F.Supp.2d at 1238.

The Takings Clause "is designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4

L.Ed.2d 1554 (1960)) (internal quotation marks and brackets omitted).

### 2. Regulatory takings

The government can violate the Takings Clause either by direct government appropriation of property without just compensation as explicitly detailed in the Fifth Amendment, or by government regulation—a· regulatory taking—which is not referenced in the text of the Fifth Amendment and involves relatively recent judicial developments. *See Tahoe–Sierra Pres. Council,* 535 U.S. at 321–22, 122 S.Ct. 1465; *see also Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (Holmes, J.) (giving birth to the concept that government regulation can constitute a taking). "[A] regulatory taking occurs when the value or usefulness of private property is diminished by a regulatory action that does not involve a physical occupation of the property." *Hotel & Motel Ass'n of Oakland v. City of Oakland,* 344 F.3d 959, 965 (9th Cir.2003) (quoting *Levald, Inc. v. City of Palm Desert,* 998 F.2d 680, 684 (9th Cir.1993)).

▮ The Supreme Court's jurisprudence involving regulatory takings is characterized by "essentially ad hoc, factual inquiries designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe–Sierra Pres. Council,* 535 U.S. at 322, 122 S.Ct. 1465 (citations and internal quotations omitted). While property may be regulated to a certain extent, "if regulation goes too far it will be recognized as a taking." *Id.* at 326, 122 S.Ct. 1465 (quoting *Pennsylvania Coal Co.,* 260 U.S. at 415, 43 S.Ct. 158 (Holmes, J.)). A land use regulation goes too far and constitutes a taking if: (1) the regulation denies a landowner all economically viable use of the property, *or* (2) the regulation does not substantially advance a legitimate government interest. *Agins v.*

*City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980).

### 3. Facial regulatory takings challenges

▮ A facial takings challenge involves a claim that the mere enactment of a statute constitutes a taking, as contrasted to an as applied challenge, which involves a claim that the particular impact of a government action on a specific piece of property requires the payment of just compensation. *Hotel & Motel Ass'n,* 344 F.3d at 965; *see Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 494–95, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). Since the Committee is attacking the Scenic Review Ordinance before its implementation and has not alleged that TRPA has denied permits under the Ordinance, the Committee is raising a facial challenge. As facial challenges are more difficult to assert, the Committee faces an "uphill battle." *Tahoe–Sierra Pres. Council,* 535 U.S. at 320, 122 S.Ct. 1465 (quoting *Keystone,* 480 U.S. at 495, 107 S.Ct. 1232).

### 4. Since plaintiff did not allege a total loss of value, *Penn Central* provides the proper analytical framework

▮ Under the first *Agins* test, a government regulation constitutes a taking if it denies an owner economically viable use of her land. *Agins,* 447 U.S. at 260, 100 S.Ct. 2138. The denial of all economically viable use is an "extraordinary circumstance" and a "relatively rare situation[ ]" that upsets the "usual assumption that the legislature is simply 'adjusting the benefits and burdens of economic life' " and makes the functional basis for the rule—that the Government could hardly pay for every regulation that diminishes property values—inapplicable. *Lucas v. South Carolina· Coastal Council,* 505 U.S. 1003,

1017–18, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (quoting *Penn Central Transp.*, 438 U.S. at 124, 98 S.Ct. 2646). Multiple factors are relevant in the analysis of regulatory takings claims, and the court should focus on the "parcel as a whole" in analyzing regulatory takings. *Tahoe–Sierra Pres. Council*, 535 U.S. at 327, 331, 122 S.Ct. 1465.

■ In this case, the Committee's complaint does not allege that the Scenic Review Ordinance will deprive its members of all economically viable use of their land or constitutes a total taking of the value of the entire parcel as a whole. Although the complaint alleges $100 million in lost property value, there is no indication that this constitutes a "total loss" in value of the "parcel as a whole." In fact, the complaint arrived at the $100 million in lost value by applying a 50% reduction for reduced view. (Compl., ¶ 52.) This is insufficient to allege a total taking of the value of the entire parcel of land.

In accordance with the Court's wording in *Lucas* that the denial of all economically viable use is a "relatively rare situation" and is an "extraordinary circumstance," the Court later explained that "anything less than a 'complete elimination of value,' or a 'total loss,' the [*Lucas*] Court acknowledged, would require the kind of analysis applied in *Penn Central*." *Tahoe–Sierra Pres. Council*, 535 U.S. at 330, 122 S.Ct. 1465 (quoting *Lucas*, 505 U.S. at 1019–20 n. 8, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992)). Since the Committee has not alleged a total taking of the value of the entire parcel of land, then *Penn Central* provides the proper framework to guide our takings inquiry. *Id.* Therefore, we must analyze the first *Agins* test in light of *Penn Central*'s multi-factor balancing test and the fact that the Committee is asserting a facial challenge to the ordinance.

### 5. Facial *Penn Central* Analysis

■ In analyzing whether a regulation that does not constitute a total loss in value nevertheless effects a taking, we must engage in a subset of *Agins'* first prong—total elimination of all economically viable use—by employing the multi-factor balancing test from *Penn Central* to determine if the regulation nonetheless amounts to a taking. The *Penn Central* Court identified three factors of particular significance when engaging in a takings' ad hoc, factual inquiry: (1) the economic impact of the regulation on the property owner, (2) the extent to which the regulation has interfered with distinct investment-backed expectations, and (3) the character of the government invasion. *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646.

### a) Economic Impact

■ The Committee's entire takings claim rests upon the allegations in the complaint that TRPA's actions "deprived plaintiff of the economic viable use of property" and represents a "confiscation . . . of over $100 million" and "a loss of value of over 50%." (Compl., ¶¶ 69, 52.) Taking this allegation as true, plaintiff has stated an economic impact under the first factor. However, standing alone, this might be insufficient to state a claim under *Penn Central* because a property owner is not entitled to the most beneficial use of the property. *Penn Central Transp. Co.*, 438 U.S. at 126, 98 S.Ct. 2646; *see also William C. Haas & Co. v. City & County of San Francisco*, 605 F.2d 1117, 1120–21 (economic impact—decrease in affected property's value from $2 million to $100,-000—standing alone is not sufficient to state a taking). Furthermore, courts have held zoning laws that affect existing uses of property to not constitute a taking even "when the challenged governmental ac-

tions prohibited a beneficial use to which individual parcels had previously been devoted and thus caused substantial individualized harm." *Penn Central Transp. Co.*, at 125, 98 S.Ct. 2646. Therefore, the other *Penn Central* factors become relevant in this analysis to determine if a confiscation of "over $100 million" and a "loss of value of over 50%" are enough to state a takings claim under *Penn Central.*

### b) Distinct Investment–Backed Expectations

The Committee's complaint does not reference distinct investment-backed expectations. The Amicus Brief of Pacific Legal Foundation makes a creative argument that the allegations in the complaint "imply that TRPA's actions have interfered with Plaintiff's distinct, investment-backed expectations." (Amicus Brief of Pac. Legal Found., at 4.) However, this assertion runs counter to the extensive collection of documents that we have judicially noticed regarding the regulatory history of the Lake Tahoe Basin.

First, we believe that *Penn Central* requires an analysis of the reasonableness of a landowner's investment-backed expectations. *See Palazzolo v. Rhode Island,* 533 U.S. 606, 635, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (O'Connor, J. concurring) ("[T]he regulatory regime in place at the time the claimant acquires the property at issue helps to shape the reasonableness of those expectations."). In other words, the landowner's investment-backed expectations must be reasonable.

In this case, TRPA adopted SR–1, the scenic threshold for which the Scenic Review Ordinance is designed to attain, in

1982. (Def.'s RJN, Ex. 1.) Also, in 1982, TRPA passed SR–4, the policy statement insuring that the built environment—specifically the height, bulk, texture, form, materials, colors, lighting, signing and other design elements of new remodeled and redeveloped buildings—are compatible with the natural, scenic, and recreational values of the region. (*Id.* at A–10.) The Compact and the Code prohibit both *projects* and ordinances that cause these thresholds to be exceeded. (Compact, Art. V(g); Code § 6.3.A(2), Def.'s RJN, Ex. 2.)

Under *Palazzolo,* the extensive regulatory structure in the Lake Tahoe Basin does not preclude a finding that the Scenic Review Ordinance amounts to a taking under the *Penn Central* test, however, we believe that it does inform our decision regarding the reasonableness of plaintiff's investment-backed expectations. *Palazzolo,* 533 U.S. at 630, 121 S.Ct. 2448. Prior to the adoption of the Scenic Review Ordinance, TRPA had regulated building design characteristics such as exterior lighting, setbacks, landscaping, snow storage, and site design. (Def.'s RJN, Ex. 2, Code §§ 30.5.A (site design), 30.5.C (snow storage), 30.5.D (setbacks), 30.7 (landscaping), and 30.8 (exterior lighting).) TRPA also regulated the height of buildings and other structures for view enhancement purposes. (Code §§ 22.2–22.6.) [18]

Additionally, the Scenic Review Ordinance provides several levels of review relating to the extent of the project and does not apply to homeowners until they seek a permit or commence a project or activity. (Def.'s RJN, Ex. 12, Code §§ 30.15.B (Review Process) (triggered by "any activity requiring a TRPA permit"),

---

**18.** The court will take judicial notice of Code Sections 22.2 to 22.6, which are located on TRPA's website. *See http://www.trpa.org/Ordinances/pdffiles/Code22.pdf.* The complaint makes extensive references to the Compact, the Code, Resolution 02–18, Resolution 02–

21, and the 2001 Threshold Report. As such, these are proper items for us to consider on a 12(b)(6) motion under the doctrine of incorporation by reference. *Ritchie,* 342 F.3d at 908.

30.15.C (Levels of Scenic Mitigation) (based on level of the "activity or project").) Notably, the Scenic Review Ordinance specifically exempts homeowners who do not seek to modify or change their existing homes. (Def.'s RJN, Ex. 12, Ch. 4 at 1 (listing exempt activities).) Exact in-kind replacements do not trigger the Scenic Review Ordinance unless they affect the color of the structure. (Def.'s RJN, Ex. 12, Code § 30.15.C(1)-(2).) Therefore, to the extent that the average homeowner is not seeking to implement a major reconstruction or expansion, the Scenic Review Ordinance will have little immediate impact on investment-backed expectations.[19] (See Appraiser's Letter, Def.'s RJN, Ex. 16, Attach. E at 158) ("In summary, the vast majority of lakefront residential properties are currently improved. These existing residential structures will not be impacted by these scenic [Best Management Practices] ... until such time as a major remodeling or reconstruction project is initiated.").

In the context of the stock market, the value of the stock of a particular corporation relates to many factors, including the corporation's capitalization, its industry, its potential for growth, its corporate governance structure, and various other factors. If the articles and bylaws of a corporation give the board and managers too much power vis-a-vis the shareholders, then there is the potential that the board and managers will increase agency costs and will not perform in the best interest of shareholders. Furthermore, if the corporation has anti-takeover measures in place, shareholders will be unable to capture any potential takeover premium. Given perfect information, the value of the stock should decrease as a result.[20]

Similarly, the value of a particular parcel of real estate encompasses many factors, including the location, the condition and age of any buildings on the land, and other economic and social factors. TRPA possesses tremendous regulatory power in the Basin. As discussed above, this power includes adopting ordinances relating to land use and scenic concerns. Like the investor purchasing stock with an unequal relationship between managers and shareholders should devalue that stock, purchasers of land in the Tahoe Basin have known of the tremendous power conferred on TRPA by Nevada, California and the Federal government since at least 1980. This tremendous power has included the ability to regulate scenic concerns, and in particular views of the shore from the lake (SR–1), since 1982. In addition, the SR–4 policy statement expressly states that TRPA will insure that the height, bulk, texture, form, materials, and colors are compatible with the scenic values of the region. Unlike the recent incidents of corporate fraud, this information was public knowledge and the average purchaser of land in the Basin, and particularly the shoreland,

19. Since plaintiff is bringing a facial challenge, we view it as appropriate to consider the abstract investment-backed expectations on shoreland property owners as a whole.

20. The fluctuation in the stock market and the recent stock market bubble in the late 1990's demonstrates that investors do not have perfect information and may act irrationally. To this extent, investors' reasonable investment-backed expectations may be upset by incidents of corporate fraud or other such pieces of "hidden information." However, to the extent the investments are based on market euphoria, marked by irrationality and lack of caution and skepticism, these investment expectations might not be reasonable. See John C. Coffee, Jr., Understanding Enron: "It's about the Gatekeepers, Stupid", 57 Bus. Law. 1403, 1412 (2002) (describing the hallmarks of an irrational market, in which gatekeepers (auditors) have incentives to acquiesce to the corporation's managers in order to allow the managers to maximize short-term profits at the expense of long-term profits).

should have adjusted her investment backed expectations accordingly.[21]

Under these circumstances, we believe that the Scenic Review Ordinance does not significantly impair the reasonable investment-backed expectations of the average homeowner in the Lake Tahoe shoreland. In mounting a facial challenge, plaintiff faces an "uphill battle," and we conclude that plaintiff has not been able to secure the high ground.

Therefore, even taking the allegations in the complaint in the light most favorable to the Committee, we conclude that the Scenic Review Ordinance *on its face* does not interfere with the reasonable investment backed expectations of the Committee's members. Since the Committee has chosen to raise a facial challenge, which is somewhat inapposite to the ad hoc, factual inquiries necessary under *Penn Central*, we have analyzed the Committee's members' reasonable investment backed expectations in the abstract. In so finding, we do not comment on whether a particular shoreland property owner with more compelling facts might be able to make a better case for this factor in an as-applied challenge to the Ordinance. Nor do we find that TRPA may never upset the reasonable investment-backed expectations of Basin property owners by adopting new ordinances. However, under this particular ordinance, we find that the Committee's complaint has not stated facts sufficient to establish that the Scenic Review Ordinance on its face has interfered with plaintiff's reasonable investment-backed expectations.

### c) Nature of Invasion

A taking will be more readily found "when the interference with property can be characterized as a physical invasion by the government than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central Transp. Co.*, 438 U.S. at 124, 98 S.Ct. 2646 (citation omitted). In this case, the nature of the government invasion is not physical. Although the ordinance will tend to push homes in the shoreland to paint in earthtone colors, this does not amount to the government physically invading the property. Furthermore, the homeowner has a choice of approved earthtone color paints without necessitating TRPA review, and a homeowner can paint his house blue by meeting other scenic best management practices. (Code § 30.15.C, Def.'s RJN, Ex. 12.) Therefore, the government's invasion is not physical in nature and this factor weighs against finding a facial taking under *Penn Central.*

### d) Plaintiff fails under Penn Central

Despite the fact that the Committee alleges over $100 million in property loss, the Committee has failed to overcome the "uphill battle" entailed in a facial challenge. The extent of the judicially noticed documents detailing the extensive history of regulation at Lake Tahoe and the power of TRPA to regulate scenic concerns weigh heavily against a finding that the Scenic Review Ordinance amounts to a facial taking under *Penn Central.*

The Committee's main argument in its opposition is that it is too early to resolve

---

**21.** While the ordinance might negatively impact the value of certain undeveloped shoreland parcels, the ordinance may very well increase the long-term value of certain recently constructed parcels. Recently built homes will capture the benefits of the new ordinance in the form of decreased visual impact on

Lake Tahoe as a whole without immediately incurring the costs associated with the new scenic regulations. These potentially divergent factual scenarios are another factor that counsels against bringing a facial *Penn Central* challenge to the ordinance.

this issue because of the factual nature of the inquiries. However, we are satisfied that the complaint failed to allege facts sufficient to constitute a taking under *Penn Central,* especially given the judicially noticed documents that counsel against such a finding. In making this ruling, we do not comment on whether any shoreland property owner could present a factual circumstance that would be sufficient to allege and succeed on proving a taking under *Penn Central.* We limit our holding to the statement that the Committee's complaint failed to make such a showing.

### E. Claim Four: TRPA Effected a Taking Because the Ordinance is Not "Substantially Related to a Legitimate Government Interest"

"The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance [a] legitimate state interest[ ] ...." *Agins,* 447 U.S. at 260, 100 S.Ct. 2138. This claim is based on the theory that the government "never had constitutional authority to adopt the ordinance, regardless of any compensation that might be offered." *Hotel & Motel Ass'n,* 344 F.3d at 966.

#### 1. Legitimate Government Interest

■ Plaintiff wisely does not seriously dispute that the intended purpose of the Scenic Review Ordinance is a legitimate government interest. The Scenic Review Ordinance is designed to regulate the scenic impact of residential housing on views in the Lake Tahoe Basin. This interest is undeniably legitimate. *See Members of City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 805, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984) (commenting that "[i]t is well settled that the state may legitimately exercise its police powers to advance [a]esthetic values"); *see Penn Central Transp. Co.,* 438 U.S. at 129, 98 S.Ct. 2646 (recognizing that the Supreme

Court has found that government entities may "enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city."); (*see also* Compact, Art. I(a)(6) ("[m]aintenance of the social and economic health of the region depends on maintaining the significant scenic ... values provided by the Lake Tahoe Basin."); Art. I(a)(8) (noting that "preserving scenic and natural areas" is the responsibility of various government entities); Art. I(a)(10) (finding that "[i]n order to preserve the scenic beauty and outdoor recreational opportunities of the region, there is a need to insure an equilibrium between the region's natural endowment and its manmade environment"); Art. II(i) (noting that environmental threshold carrying capacity includes "a significant scenic ... value of the region"); Art. V(b) (mandating that TRPA shall develop environmental threshold carrying capacities, which include significant scenic values); Def.'s RJN, Ex. 1 at A–10 (TRPA's adoption of three scenic thresholds, including a scenic threshold addressing roadway and shoreline units).)

#### 2. Substantial Advancement

■ Since the governmental interest in this case is undeniably legitimate, the crux of the *Agins* analysis is whether the ordinance *substantially advances* TRPA's legitimate interest in scenic quality at Lake Tahoe. Although courts must engage in "ad hoc factual" determinations in assessing regulatory takings, the takings issue can be decided on a motion to dismiss and a court can consider judicially noticed documents in making such a finding. *Hotel & Motel Ass'n,* 344 F.3d at 966–67. As the court noted in *Hotel & Motel Ass'n,* "[r]egulatory takings claims, in short, do not easily fit into a preordained construct or little box; individualized scrutiny of such claims does not foreclose resolution on a

motion to dismiss or a motion for summary judgment." *Id.* at 966.

Although a court can decide this issue on a motion to dismiss, the application of the "substantial advancement" test is unclear. *See, e.g., Chevron USA, Inc. v. Cayetano,* 224 F.3d 1030, 1039–41 (9th Cir. 2000) (discussing the unclear and unsettled meaning of the "substantial advancement" test). While the Committee did not address this issue directly in its opposition, the Amicus Brief of Pacific Legal Foundation argues that the "substantial advancement test requires a higher standard of scrutiny than the more deferential rational basis test." [22] (Amicus Brief of Pac. Legal Found., at 5) The Amicus argues that the substantial advancement test requires an "essential nexus" between the imposition of a regulation and the harms "that would otherwise be caused by the unregulated use of property." (*Id.*)

We agree with the Amicus and the Committee that the substantial advancement test requires a stricter standard of review than the deferential rational basis test. This entails establishing a connection of some sort between the ordinance's means and its intended end. *Cayetano,* 224 F.3d at 1040. However, the exact degree of required connection between means and ends is still unclear.

 We are not convinced that the "essential nexus" test is the appropriate analytical tool. After the briefing was complete in this case, the Ninth Circuit spoke directly to this issue in *Hotel & Motel Ass'n.* [23] In that case, the Ninth Circuit decided whether an ordinance substantially advances a legitimate government interest by analyzing if it bears a "reasonable relationship" to that interest. *Hotel & Motel Ass'n,* 344 F.3d at 968. Under our reading of that case, we must inquire into the legislative findings, the documentation of past problems, the alternatives considered, and other relevant factors to determine if the regulation is a reasonable response to the perceived problem. *Id.* at 967–68 (discussing the facts, findings, backdrop, and circumstances of the particular case to assess the "reasonableness" of regulatory action in relation to the perceived problem). We agree with plaintiff and the Amicus that this standard requires a more in-depth analysis than a deferential rational basis analysis; however, after analyzing the ordinance and the judicially noticed documents, we find that the Scenic Review Ordinance meets the intermediate level of scrutiny—a "reasonable relationship" exists between the ordinance's means and its intended ends—entailed in the substantial advancement analysis.

### 3. Interplay of complaint and judicially noticed documents

The Committee's complaint alleges in conclusory fashion that "defendant failed to advance a legitimate state interest." (Compl., ¶ 67.) The Committee's complaint also alleges relevant considerations in a different claim, which is incorporated into the takings claim, that TRPA failed to "consider alternatives to the proposed project," that TRPA failed to consider "implementing mitigation measures," and that "TRPA's actions will result in a direct physical change to the environment as well

---

**22.** Plaintiff briefly argues that the "substantial advancement" test requires a higher level of scrutiny in its response (# 63) to TRPA's citation of additional authority (# 58).

**23.** Defendant TRPA submitted a letter (# 58) addressing the applicability of *Hotel & Motel*

*Association.* Pursuant to our minute order (# 60), which permitted plaintiff and Amici to file a response, plaintiff (# 63), the Attorney General of California (# 66), and Pacific Legal Foundation (# 67) filed responses.

as foreseeable indirect changes to the environment." (*Id.* at ¶ 40.)

 Standing alone, these allegations might be sufficient to state a takings claim under Rule 8 of the Federal Rules of Civil Procedure. However, we took judicial notice of the Compact, the Code, the 2001 Threshold Report, the Scenic Review Ordinance, TRPA staff memoranda, and the Scenic Threshold Review Report under Federal Rule of Evidence 201.[24] (Def.'s RJN, Exs. 2, 7, 12, 14, 15.) We stated in our order (# 73) that we were only taking judicial notice of these documents to the extent that the facts or findings were not subject to reasonable dispute. *See* Fed. R.Evid. 201. Therefore, to the extent that the contents of these documents conflict with the factual allegations of the complaint, we will take as true the *factual* allegations of the complaint. *See, e.g., Lee v. City of Los Angeles,* 250 F.3d 668, 690 (9th Cir.2001). However, we will not necessarily take as true legal conclusions cast as factual allegations when those allegations conflict with the judicially noticed documents.[25]

#### 4. TRPA extensively documented scenic concerns

In the 2001 Threshold Report, TRPA addressed the Basin's scenic resources in over 78 pages and additional appendices. (Def.'s RJN, Ex. 7.) TRPA documented problems in residential housing, including a "dramatically increased pace of residential redevelopment and a corresponding and dramatic loss of scenic quality." (Def.'s RJN, Ex. 7, Ch. 8 at 13.) These problems were first noted in 1991 and raised a serious concern in 1996. (*Id.*) The Report noted that this degradation in scenic quality was occurring despite "apparent compliance with regulations intended to prevent this drop." (*Id.*)

Furthermore, the Report noted several factors—increase in mass and scale of structures, reduction in structure setback, architectural features that increase visibility, and unauthorized removal of trees and understory vegetation—that combine to produce an alarming trend in the Basin and a subsequent drop in scenic threshold scores.[26] (*Id.* at 13–14.) The Threshold

---

24. We could have taken judicial notice of some of these documents under the doctrine of incorporation by reference. *See supra* note 18.

25. We decline to adopt the proposition that conclusory allegations or factual allegations not subject to reasonable dispute in the complaint must always be taken as true in deciding a motion to dismiss when the defendant submits judicially noticed documents. For example, the complaint alleges that Resolution 02–18 adopted new scenic thresholds for the Basin. The judicially noticed documents showed that this allegation was based on an erroneous understanding of the Board's July 24, 2002, action. Likewise, if the complaint stated that the sun was red or that Lake Tahoe was located in Oregon, we could properly take judicial notice of contrary facts and accept those judicially noticed facts (i.e. sun is yellow) as true because those facts are both generally known in the territorial jurisdiction of the trial court and capable of accurate and ready determination. *See* Fed.R.Evid. 201.

Furthermore, conclusory allegations such as the fact that TRPA's actions "failed to advance a legitimate state interest" can be overcome by the extent of the judicially noticed record. *See Hotel & Motel Ass'n,* 344 F.3d at 967 (deciding "substantial advancement" issue on motion to dismiss through ordinance on its face and accompanying legislative findings); *see also W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981) (although courts generally assume the facts alleged are true, courts do not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations"); *In re Stac Elecs.,* 89 F.3d at 1403 (conclusory allegations and unwarranted inferences are insufficient to defeat a motion to dismiss).

26. In fact, the complaint specifically lists many of the 2001 Threshold Report's findings. (Complaint, ¶¶ 13–15.) In addition to judicial notice and incorporation by reference, this is yet another reason that we can consider these findings as they are detailed in the complaint itself.

Report documented how inadequate assessment and permit conditions relating to these elements have contributed to these conditions. (*Id.* at 16.) The 1991 and 1996 Reports noted "deficiencies related to design criteria (height, setback, color, etc.) and use of unclear and inappropriate scenic assessment methodology as contributing to [the] lack of threshold attainment." (*Id.*) The results of the 2001 Report reconfirms those conclusions. (*Id.*) Therefore, it is clear that TRPA extensively documented the problem (degradation in scenic quality due to residential housing) and the cause (inadequate permit conditions and scenic assessment methodology).

### 5. TRPA's failure to consider mitigation measures

Based on the 2001 Threshold Report, TRPA was reasonable in enacting some sort of solution to the above noted problems. The Committee asserts that TRPA did not consider alternatives or mitigation measures short of the drastic nature of the Scenic Review Ordinance. According to the 2001 Report, 20 shoreline units are in attainment and 13 units are in non-attainment. (*Id.* at 5.) Four additional units fell from attainment since 1996, and ten units have fallen out of attainment as compared to the three units out of attainment in 1982 when the scenic thresholds were adopted. (*Id.*; Def.'s RJN, Ex. 15, at 118.) TRPA could have attempted to implement mitigation measures before adopting the Scenic Review Ordinance or TRPA could have focused its attention on the shoreline units that were out of attainment. More specifically, TRPA could have focused solely on the residential housing causing the biggest problem. We find that this fact weighs in favor of the Committee's argument that the means are not substantially related to the ends because TRPA has not engaged in trial and error to insure that the Scenic Review Ordinance is an appropriate response to the noted problems. However,

we do not believe that TRPA's approach in adopting a comprehensive solution is fatal to finding that the ordinance substantially advances TRPA's interest in scenic quality.

### 6. Relation of scenic problem to TRPA's solution

Notably, the Scenic Review Ordinance primarily addresses the factors specifically identified in the 2001 Report as they relate to scenic quality. TRPA also noted that the degradation in scenic quality was a result of inadequate methodology and permit conditions. TRPA studied the problem over a period of ten years before adopting a reasonable response. This was not a rash response to recent development. TRPA's proposed solution is aimed at preventing further degradation in scenic quality while gradually improving its current problems as residential owners apply for permits. Furthermore, while the Scenic Review Ordinance is extremely complex, in this case that actually weighs in favor of finding that the ordinance is substantially related to TRPA's interest in scenic quality as it allows TRPA to tailor its response more specifically to the problems identified in the 2001 Threshold Report.

### 7. The comprehensive Scenic Review Ordinance (means) is substantially related to curbing scenic degradation (ends)

As extensively documented in Section I(G) of this order, the Scenic Review Ordinance provides applicants with different levels of review and several different options for proceeding with a permit application. First, the ordinance exempts in-kind replacements and painting in approved colors. Second, the level of review is scaled so that smaller projects are only required to engage in scenic best management practices while residential rebuilds or new construction must engage in extensive compli-

ance. This will minimize the impact on existing homes and will likely streamline the review process.

The Scenic Review Ordinance also provides three methods for homeowners to achieve approval, including implementing mitigation methods, achieving an adequate color contrast score, or implementing an independent review. This provides different options for landowners to achieve compliance with the ordinance while also minimizing the structure's scenic impact. The Scenic Review Ordinance is not a one-size fits all type approach, and we find that its different options result in a close fit between the ordinance's means and its desired ends.

Therefore, we find that this extensive and detailed procedure is reasonably related to TRPA's legitimate interest in scenic quality. TRPA included various levels of review to streamline routine maintenance and to provide applicants with different options in order to complete a project without sacrificing the property rights of the homeowner.

Obviously, a homeowner wanting to have a glass house will likely be frustrated by this ordinance. However, it is apparent that a homeowner who wants particular views of Lake Tahoe or a particular type of structure can plan around these requirements through the use of scenic BMPs and clever architectural work. The ordinance provides several options and is tailored specifically to the harms cited in the 2001 Threshold Report dating back to the 1991 Threshold Report. Therefore, there is a "nexus" between the harm cited in the 2001 Threshold Report (contrast of residential housing with natural environment, ineffective methodology and permitting conditions) and the means (more objective methodology emphasizing blending in with natural environment rather than contrasting) contained in the Scenic Review Ordinance.[27] As we find that there is a "nexus" between the means and the ends, we necessarily find that the Scenic Review Ordinance meets the reasonable relationship test.

We note parenthetically that the effectiveness and efficacy of the scenic review system will depend on the ability of homeowners to work within the system to construct houses that minimize scenic impact while maximizing lake views and other desirable features. To this end, we caution TRPA that it should heed its own advice in its 2001 Threshold Report that public education of homeowners, contractors, and architects needs to be improved.[28]

Therefore, for the reasons stated above, we find that the ordinance substantially advances a legitimate government interest.[29] In conclusion, since the Committee's claim fails to state a takings' claim under either prong of the *Agins* test, we must dismiss the Committee's takings' claim.

---

**27.** Contrary to the assertion of Pacific Legal Foundation at the hearing, a homeowner can paint his house blue. Likewise, an applicant can have windows facing the Lake. These features will reduce the visual magnitude score, but a property owner can still implement other scenic BMPs or other mitigation measures in order to meet the appropriate rating score. (*See* Code § 30.15.C(3)-(5), Def.'s RJN, Ex. 12.)

**28.** Apparently, TRPA conducted public workshops on the new scenic review system on January 14th and 15th, 2004. *See*

*http://www.trpa.org/Scenic/shorelineworkshopdates.pdf.*

**29.** Although the Committee's substantive due process claim was dismissed in our oral decision because it should have been brought as a takings claim, we note that such a claim would necessarily have been foreclosed because it is reviewed under a more deferential standard of review than the "substantial advancement" test. As the Scenic Review Ordinance meets the "substantial advancement" test, it necessarily meets the more deferential rational basis test.

**F. Claim Five: The Scenic Review Ordinance is Arbitrary, Vague, and Ambiguous**

The supplemental amendment to the complaint asserts that the Scenic Review Ordinance is "arbitrary, vague, and ambiguous" without much explanation. (Supp. Compl., ¶ 94.) We find that plaintiff might be asserting a facial vagueness challenge outside the context of the First Amendment.[30] A facial vagueness challenge outside the context of the First Amendment "present[s] a hurdle that is difficult for the [plaintiff] to scale." *Hotel & Motel Ass'n,* 344 F.3d at 971. In bringing such a facial attack, "the challenger must establish that no set of circumstances exists under which the [statute] would be valid." *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

Although there is some doubt as to the applicability of *Salerno, see City of Chicago v. Morales,* 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (plurality opinion) (stating that the *Salerno* standard is dictum), the *Hotel & Motel Ass'n* holding made it clear that "a party challenging the facial validity of an ordinance on vagueness grounds outside the domain of the First Amendment must demonstrate that 'the enactment is impermissibly vague in all of its applications.'" *Hotel & Motel Ass'n,* 344 F.3d at 972 (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)).

"A statute can be impermissibly vague for either of two independent reasons[:] [ (1) ] it fails to provide persons of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits[, or (2) ] it authorizes and encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000).

**1. Failure to provide a reasonable opportunity to understand what is prohibited**

While the Scenic Review Ordinance is complex, the general concept provides persons of ordinary intelligence a reasonable opportunity to understand what it prohibits—structures that are too visible vis-a-vis the natural environment. The detailed procedures, including differing levels of review and a scenic review panel, ensure that the ordinance is not impermissibly vague in all of its applications. Although the specifics of the ordinance are complex, ordinary repair and maintenance is exempt from TRPA's review.

As for more extensive projects, a person of ordinary intelligence should be able to work through the specifics of her individual project to determine what is and what is not permitted. More extensive projects are likely to require architects and other repeat players, who should be experienced and proficient at understanding the intricacies of the ordinance. The Ordinance makes it quite clear that a homeowner would not be able to build a large glass warehouse with no screening from the Lake. In sum, there are circumstances under which the ordinance would be valid in this respect and this aspect of the plaintiff's vagueness challenge must fail.

**2. Encouraging arbitrary and discriminatory enforcement**

The Scenic Review Ordinance also does not encourage arbitrary and discriminatory enforcement in all of its applications. The ordinance provides numerical guideposts, different levels of review, and detailed procedures depending on the specifics of the project. (*See* Code § 30.15.C–D; Def.'s RJN, Ex. 12; Def.'s RJN, Ex. 17, Appendix H (Visual Assessment Tool).)

---

**30.** We will analyze the First Amendment vagueness issue in section IV(G).

While there is some discretion in the scenic assessment process (such as estimating the percentage of a structure visible from the Lake or the independent review using other professionally accepted methods of evaluating scenic impacts), this does not necessarily encourage arbitrary and discriminatory impact. As extensively detailed above, the Scenic Review Ordinance provides objective criteria in order to measure the scenic impact of a residential structure. Although the independent review may permit some varying enforcement of the specifics of the ordinance, the independent review is available to all applicants. (Code § 30.15.E, Def.'s RJN, Ex. 12.) In the aggregate, this should minimize the effect of arbitrary and discriminatory enforcement by individual TRPA reviewers.

Furthermore, the Committee has failed to point to particular language in the Scenic Review Ordinance or particular applications which are vague. On the record before us, it appears that the Scenic Review Ordinance is not vague. Therefore, for the reasons previously outlined, we find that the Scenic Review Ordinance is not impermissibly vague in all of its applications because the ordinance provides explicit guidelines, several levels of review, and independent review. As such, we must dismiss the Committee's claim that the Scenic Review Ordinance is arbitrary, vague, and ambiguous.

**G. Claim Six: The Scenic Review Ordinance Violates Plaintiff's Rights to Freedom of Speech and Expression and Political Speech**

The Committee makes the novel claim that the mere enactment of the Scenic Review Ordinance violates its member's First Amendment rights. Since the complaint challenges the enactment of the statute, plaintiff raises a facial challenge to the ordinance. We note that courts are not as reluctant to entertain facial challenges in the First Amendment context because "those who desire to engage in legally protected expression ... may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Roulette v. City of Seattle,* 97 F.3d 300, 303 (9th Cir.1996) (quoting *Brockett v. Spokane Arcades, Inc.,* 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985)). As a result of this speech-protective purpose, "the Supreme Court has entertained facial freedom-of-expression challenges only against statutes that, 'by their terms,' sought to regulate 'spoken words,' or patently 'expressive or communicative conduct' such as picketing or handbilling." *Id.* (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612–13, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)). Since the Scenic Review Ordinance does not seek to regulate spoken words, we must analyze the threshold inquiry of whether it regulates "patently expressive or communicative conduct."

**1. Is residential housing patently expressive or communicative?**

First Amendment analysis applies in this case if residential housing is "sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments." *Spence v. Washington,* 418 U.S. 405, 409, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The Amicus Brief of Pacific Legal Foundation persuasively argues that residential housing can constitute speech and urges this court to extend First Amendment protection to residential housing. However, while not dismissing the possibility that residential housing *can* constitute free speech, we do not believe that this is the proper context to so hold. *See Nordyke,* 319 F.3d at 1189 (commenting that the inquiry into whether the action is protected expressive conduct is best suited to an as applied challenge).

The *Spence* Court established a test for whether an expressive act or symbol constitutes speech: (1) whether the actor had an intent to convey a particular message, and (2) in context, would the act or symbol reasonably be understood by the viewer to be communicative. *Spence*, 418 U.S. at 411, 94 S.Ct. 2727; *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 294, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984). The plaintiff bears the burden of establishing both elements. *Clark*, 468 U.S. at 293–94 n. 5, 104 S.Ct. 3065.

The Committee has failed to allege facts that either its members intend to convey a message in the design of their houses or that the act or symbol of redesigning its member's homes would be understood by the viewer to be expressive. The question is not whether a residential home is speech, but whether the remodeling or rebuilding of a home that affects the design, color, size, visibility and other aspects of the home's overall appearance is speech. *See Nordyke*, 319 F.3d at 1189 ("[s]omeone has to do something with the symbol before it can be speech" so "the correct question is whether gun possession is speech, not whether a gun is speech"). Plaintiff has failed to either allege in its complaint or make an argument in its opposition that the color, design, visibility, size, or shape of a home constitutes expression worthy of First Amendment protection.

Although the Amicus attempts such an argument, we are not persuaded that the color, size, design, and other elements of a residential house are understood by the viewer to be communicative or expressive under *Spence* in the context of a facial challenge. Therefore, the color, design, setback, visibility and other aspects of residential housing regulated by the Scenic Review Ordinance are not, in the abstract and on their face, expressive under *Spence*.

Typically, a person remodeling her house has no intent to convey a particular message, nor is any particular message likely to be understood by those who view it. Although some residential remodels or rebuilds *may* involve an intent to convey an artistic, political, or self-expressive message, the great majority of remodeling or rebuilding projects involving residential housing are functional in nature and are not commonly associated with expression. Since plaintiff brings a facial challenge, we find that the ordinance does not on its face implicate patently expressive or communicative conduct *See id.* (noting that the presence of some guns which bear the NRA banner and the text of the Second Amendment does not impugn the facial constitutionality of the disputed ordinance when the vast majority of prohibited guns bear no message); *Roulette*, 97 F.3d at 304 n. 7 (commenting that the district court correctly held that the unusual predicament of one particular individual was an insufficient basis for striking down the ordinance on its face).

**2. The Scenic Review Ordinance is not directed narrowly and specifically at expression**

Even if some permutations of residential housing could constitute expression, the plaintiff's challenge still fails. A facial freedom of speech attack must fail unless the statute is "directed narrowly and specifically at expression or conduct commonly associated with expression." *Id.* at 305 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 760, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)); *Nordyke*, 319 F.3d at 1190. Even if we were to consider some incarnations of residential housing to be expressive, the Scenic Review Ordinance is not directed narrowly and specifically at such expression. The Scenic Review Ordinance is a neutral law of general applicability and its function is

to ensure that the man-made environment blends in with the natural environment through a detailed point system. The ordinance is not targeted at preventing a homeowner's expression—such as building a replica of the White House or painting her house red, white, and blue—although such results would likely be difficult or impossible to achieve under the ordinance without extensive mitigation measures. Therefore, the ordinance is not "directed narrowly and specifically" at either expression or conduct commonly associated with expression.

As discussed above, such an issue would be presented more squarely in an as-applied challenge and our holding does not in any way limit such an action. *See Roulette,* 97 F.3d at 304 n. 10 (commenting that, in rejecting a facial First Amendment challenge, "nothing we say today forecloses the possibility of mounting a successful as applied challenge to the Seattle ordinance"). Therefore, we find that the facial challenge to the Scenic Review Ordinance on First Amendment grounds must fail.

### 3. Vagueness and Overbreadth

Although plaintiff does not clearly articulate whether it is challenging the Scenic Review Ordinance on vagueness or overbreadth grounds, Amicus Curiae, Pacific Legal Foundation, makes these arguments in its brief. Therefore, we will now address these issues.

### a) Overbreadth

The justification for the overbreadth doctrine is "the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court." *Taxpayers for Vincent,* 466 U.S. at 800, 104 S.Ct. 2118. However, facial overbreadth challenges are the exception to the general rule and their limited function attenuates as the otherwise unprotected behavior that they forbid the State to

sanction moves from pure speech to conduct. *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908.

Therefore, "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Taxpayers for Vincent,* 466 U.S. at 801, 104 S.Ct. 2118. Thus, the "overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 799–800, 104 S.Ct. 2118 (quoting *Broadrick,* 413 U.S. at 615, 93 S.Ct. 2908). To ensure that the social costs of the overbreadth doctrine do not outweigh the social benefits, the Supreme Court recently clarified that "a law's application to 'protected' speech [must] be 'substantial,' not only in an absolute sense, but also relative to the law's plainly legitimate applications before applying the 'strong medicine' of overbreadth." *Virginia v. Hicks,* 539 U.S. 113, 123 S.Ct. 2191, 2197, 156 L.Ed.2d 148 (2003) (internal citations omitted).

■■■ "It is well settled that the state may legitimately exercise its police powers to advance [a]esthetic values." *Taxpayers for Vincent,* 466 U.S. at 805, 104 S.Ct. 2118. The Committee alleged that home values would drop, that no home would achieve a perfect score, that visibility of homes from the Lake would diminish, and that to achieve a perfect score a home would have to be mostly black, with many surfaces, and no windows facing the Lake. (Compl. at ¶¶ 16, 27, 52.) However, the Scenic Review Ordinance does not require that homeowners achieve a perfect score, and it provides for three different options, including independent review, for homeowners seeking a rebuild or remodel. There is not a substantial risk that the statute will significantly compromise rec-

ognized First Amendment protections, especially in relation to TRPA's legitimate goal of regulating aesthetic values.

The Committee's complaint alleges a drop in home prices and not a loss of expressive conduct. Therefore, the Scenic Review Ordinance does not reach a "substantial" amount of constitutionally protected conduct or speech, and we must dismiss the Committee's overbreadth claim.

### b) Vagueness

As discussed earlier, "[a] statute can be impermissibly vague for either of two independent reasons[:] [ (1) ] it fails to provide persons of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits[, or (2) ] it authorizes and encourages arbitrary and discriminatory enforcement." *Hill,* 530 U.S. at 732, 120 S.Ct. 2480.

 Since the Scenic Review Ordinance does not reach a "substantial" amount of constitutionally protected conduct or speech, we find that neither test is met in this case for the reasons set forth in Section IV(F). The Scenic Review Ordinance is clear as to what it prohibits on the whole (homes that contrast with the environment), *see id.* ("we can never expect mathematical certainty from our language" and "it is clear what the statute as a whole prohibits") (quotations omitted), and gives adequate guidance to the enforcement authorities and does not encourage arbitrary or discriminatory enforcement. (*See* Code § 30.15.C to E, Def.'s RJN, Ex. 12.) Neither the Amicus, Pacific Legal Foundation, nor the Committee have put forward any particular wording or application of the ordinance that might be vague, therefore, we find that the Scenic Review Ordinance is not impermissibly vague. We must dismiss the Committee's claim in this respect.

## V. CONCLUSION

The Committee has failed to state a claim for which relief can be granted. Therefore, we must dismiss the complaint in its entirety. The final question is whether or not such dismissal shall be with or without prejudice. Much of our discussion and our holding was limited to the facial nature of plaintiff's challenge. The court is aware, through both the Committee's request for judicial notice and through the Committee's argument at the hearing, that the Scenic Review Ordinance has been applied to the Committee's members. Therefore, we find it appropriate we permit the Committee to file an amended complaint with respect to the takings claim under *Penn Central* in order to attempt to state a claim. Furthermore, the Committee might be able to plead facts sufficient to state a claim that the Compact and Code required TRPA to prepare an EIS. We find no reason to allow the Committee to replead the remaining claims, which were dismissed based on the judicially noticed record, and do not appear to the Court to have a viable basis under the law, the Compact and the Code.

*THEREFORE, IT IS HEREBY ORDERED THAT,* as addressed above, TRPA's motion to dismiss (# 15) is **GRANTED.**

*IT IS FURTHER ORDERED THAT* plaintiff, The Committee, shall have sixty days from the date of the filing of this order within which to file an amended complaint with respect to (1) its takings' claim under *Penn Central,* and (2) its claim that TRPA was required to prepare an EIS under its Code and the Compact.

*IT IS FURTHER ORDERED THAT,* in the event plaintiff should desire to amend its complaint with respect to issues not addressed in this order or our oral order (# 77), plaintiff is required to file a motion, prior to the filing of any amended

complaint, detailing its reasons for such further amendment. Plaintiff shall have twenty days from the filing of this order within which to file such a motion, and such motion shall include a copy of the proposed amended complaint. If plaintiff files such a motion, defendant shall have fifteen days within which to respond to the motion. No reply brief will be permitted.